**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No.** |
| **TRI-BRIDGE VENTURES, LLC** ) | |
| **and** ) | **JURY TRIAL DEMANDED** |
| **JOHN FRANCIS FORSYTHE, III,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "SEC" or the "Commission"), 801 Brickell Avenue, Suite 1950, Miami, Florida 33131, alleges as follows for its Complaint against Tri-Bridge Ventures, LLC ("Tri-Bridge") and John Francis Forsythe, III ("Forsythe") (collectively "Defendants"), whose names and last known addresses are set forth below:

    a.     Tri-Bridge Ventures, LLC, 3001 Allaire Road, Wall Township, New Jersey 07719

    b.     John Francis Forsythe, III, 3001 Allaire Road, Wall Township, New Jersey 07719

## I.    INTRODUCTION

1.     From at least February 2017 through at least November 2022 (the "Relevant Period"), Forsythe, and his wholly-owned and controlled company, Tri-Bridge, engaged in the business of:  (a) entering into convertible notes, which are a type of security, with microcap issuers directly, or purchasing such convertible notes, portions of such notes, or shares converted from such notes at significant discounts from prevailing market prices from unaffiliated third parties; (b) converting the notes or portions of the notes into stock at significant discounts from

prevailing market prices; and (c) selling the converted shares of microcap issuer stock, often referred to as penny stocks and often trading on the over-the counter ("OTC") markets, into the public market for profits—all while failing to comply with the mandatory dealer registration requirements of the Federal securities laws.

2.      During the Relevant Period, the Defendants engaged in such convertible note activities with respect to at least 31 microcap or penny stock issuers ("Convertible Note Issuers").  And, from approximately May 2019 to November 2022, Tri-Bridge and Forsythe engaged in this convertible note business activity and sold into the market at least 10 billion shares of penny stock of at least 25 microcap issuers for more than $18 million in gross sales. Forsythe, as the managing member of Tri-Bridge at all times, had ultimate decision-making authority over Tri-Bridge's convertible note and trading activities.  Neither Tri-Bridge nor Forsythe was registered with the Commission, and Forsythe was not associated with a registered broker-dealer during the Relevant Period.  As a result, the Defendants were operating as unregistered securities dealers.

3.      By failing to comply with the dealer registration requirements of the Federal securities laws, the Defendants avoided certain regulatory obligations for dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules targeted at brokers and dealers, and maintaining books and records in accordance with applicable regulatory requirements.

4.      By engaging in the convertible note business activities described above as a regular part of their business, Defendants Tri-Bridge and Forsythe violated and, unless enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78o(a)(1)] by acting as unregistered securities dealers.

5.      The Commission requests, among other relief, that this Court enjoin Defendants Tri-Bridge and Forsythe from committing further violations of the Federal securities laws as alleged in this Complaint; order the Defendants to pay disgorgement with prejudgment interest on a joint and several basis; order the Defendants to pay civil monetary penalties; bar the Defendants from participating in any offering of a penny stock or inducing or attempting to induce the purchase or sale of any penny stock; and order the Defendants to (a) surrender for cancellation any shares Tri Bridge obtained through conversion of notes or execution of warrants, (b) surrender any conversion rights under any remaining convertible notes, (c) surrender for cancellation any unexercised warrants that were obtained in conjunction with convertible notes, and (d) provide proof of same to the Commission.

## II.      JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

7.      This Court has personal jurisdiction over the Defendants, and venue is proper in the District of New Jersey pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b).  Defendants may be found in, are inhabitants of, or transact business in the District of New Jersey, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  For example, Tri-Bridge is a New Jersey limited liability company ("LLC") that is based in this District, and Forsythe resides in this District.

8.      In connection with the conduct alleged in this Complaint, the Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of

interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## III.   <u>DEFENDANTS</u>

9.     **Tri-Bridge** is a New Jersey LLC, which Forsythe founded in or around 2016. From approximately 2017 to approximately early to mid-2020, Tri-Bridge shared office space in New York, New York with the **AD Entities**, described in Paragraph 12 of this Complaint.  After the Covid-19 pandemic began, Tri-Bridge stopped sharing the New York office space, and Forsythe based Tri-Bridge out of his residential home in the District of New Jersey.  Tri-Bridge is wholly owned and controlled by Forsythe.  Tri-Bridge has never been registered with the Commission in any capacity, nor has it been registered with any other securities regulator.

10.     **Forsythe**, 51, is a resident of Wall Township, New Jersey.  Forsythe is the sole managing member and partner of Tri-Bridge, and Forsythe controls all aspects of Tri-Bridge's business, including making all decisions with respect to its investment, convertible note, and trading activities.  Forsythe received a salary and bonuses from Tri-Bridge, and he also took money as needed from Tri-Bridge.  During the Relevant Period, Forsythe was not registered in any capacity with the Commission, was not associated with a registered broker-dealer, and did not hold any securities licenses.  However, Forsythe previously held Series 7, 24, and 63 licenses, and at various times from approximately 1996 to 2006, Forsythe was a registered representative associated with approximately 10 registered broker-dealers.

## IV.   <u>OTHER RELEVANT ENTITIES</u>

11.     **"Convertible Note Issuers"** refers to the 31 issuers during the Relevant Period, for which Tri-Bridge had convertible notes or portion of such notes that could be converted into shares of these Convertible Note Issuers' common stock, or for which Tri-Bridge had shares of

these Convertible Note Issuers' common stock that already had been converted from convertible notes, which Tri-Bridge obtained either from the issuers directly or from unaffiliated third parties.  These 31 Convertible Note Issuers—which all were microcap issuers—are identified as **Issuer 1** through **Issuer 31** in the attached **Exhibit 1**.  Among other information, **Exhibit 1** provides details regarding the earliest and latest known trade dates of Tri-Bridge's sales of the Convertible Note Issuers' common stock, and the gross sales amounts of any stock sold between approximately May 2019 and November 2022.

12.     **"AD Entities"** refers collectively to a certain three entities that were affiliated with each other through their shared owner, although at least one of the three entities had a co-owner, and to that shared owner, who Defendant Forsythe knew prior to establishing Tri-Bridge. These three affiliated entities, which were all incorporated in Delaware, and their shared owner engaged in similar business as Tri-Bridge, and had an office in New York, New York, which they also shared with Tri-Bridge prior to the Covid-19 pandemic.  The three entities affiliated with each other through their shared owner all also either had "Bridge" or "Ventures" incorporated in some way to their three respective names.

## V.     FACTS

### A.     Defendant Tri-Bridge's Business and Relationship with the AD Entities

13.     During the Relevant Period, Forsythe operated Tri-Bridge as an investment business, with investments such as convertible notes (described in Section V.B. below) and Regulation A ("Reg A") offerings, which are public offerings of securities that are exempt from the registration requirements of the Securities Act of 1933.

14.     Tri-Bridge historically had a website, which advertised its business, but Forsythe took it down at some point.  That website listed an email address—info@tribridgellc.com—and a

telephone number for external parties to be able to contact Tri-Bridge, and advertised Tri-Bridge's business and investment model as the following:

> Tri-Bridge Ventures, LLC is a New York based Institutional Investor that focuses on transactions with publicly traded companies. The firm sources, structures and executes on investments in publicly traded companies with market capitalization primarily under $250 million. The Tri-Bridge Ventures team has the experience and understanding of the public markets to identify investment opportunities as well as the ability to structure both equity and debt transactions.

15.     Forsythe, who was the only partner, controlled Tri-Bridge and was the ultimate decision-maker for Tri-Bridge's business, investment, and trading activities.  However, Tri-Bridge previously had at least four other employees and independent contractors:

  a.     An independent contractor that was Tri-Bridge's Director of Business Development from in or around 2017 to in or around 2021, and received bonuses and shares of Tri-Bridge's profits for his work, instead of a salary;

  b.     An employee who began working at Tri-Bridge with the title of Associate in or around 2017, and thereafter as Head of Research and Trading until some point in 2022 (when Forsythe moved her over to another LLC he created in or around June 2021 as a Portfolio Manager), who received a salary, as well as bonuses, based on the performance of Tri-Bridge's investments;

  c.     An employee or independent contractor who worked for Tri-Bridge from in or around 2018 to in or around 2021 as a Research Analyst, performing work similar to the work that had been performed by the former Director of Business Development, and also receiving similar compensation to the former Director of Business Development; and

   d.  An employee or independent contractor who worked for Tri-Bridge from at least June 2021 to at least August 2021 as an Analyst.

16. From approximately 2017 to approximately early to mid-2020, Tri-Bridge shared a New York City office with the **AD Entities**, which engaged in similar business as Tri-Bridge. Tri-Bridge stopped sharing that office space with the **AD Entities** in or around when the Covid-19 pandemic began.  At that point, Forsythe based Tri-Bridge out of his home in the District of New Jersey.

17. In addition to sharing office space with the **AD Entities**, Tri-Bridge utilized some of the **AD Entities'** documents for its own business.  The **AD Entities** also provided capital to Tri-Bridge to help Tri-Bridge fund some of Tri-Bridge's investments, including convertible notes, and in exchange, Tri-Bridge had a profit-sharing agreement or arrangement with the **AD Entities**.

18. In addition to its website, Tri-Bridge sought convertible notes and other investments through (a) searching through news, filings, and OTC Markets; (b) referrals; (c) word of mouth through other deals Tri-Bridge had done; (d) the **AD Entities**; and (e) attending conferences (e.g., Microcap Conference in New York), to identify potential public companies to contact for investments and convertible debt arrangements, although the conferences stopped once the Covid-19 pandemic began.

19. To fund Tri-Bridge's investment deals, Forsythe utilized either his own capital, capital from the **AD Entities**, or a combination of both.  Forsythe would contact the owner of the **AD Entities** to obtain capital as needed.

20. Despite utilizing some capital from the **AD Entities**, Forsythe made the decisions with respect to Tri-Bridge's convertible notes, including but not limited to, deciding the issuers

for convertible note arrangements, the terms of convertible notes, when to convert notes into stock, and when to sell converted stock into the market.

21.     In or around June 2021, Forsythe created another New Jersey LLC through which he started making investment deals.  However, Tri-Bridge continued to hold existing convertible notes and converted shares.

**B.      Defendants Tri-Bridge and Forsythe Engaged In Convertible Note Business As Part of Tri-Bridge's Regular Business**

22.     Convertible notes, which also are referred to as convertible promissory notes, convertible redeemable notes, and convertible debt notes, arrangements, or agreements, are a form of short-term debt securities.  Convertible notes typically are used to provide financing to penny stock issuers in need of cash, so the noteholders generally can negotiate and receive very favorable terms from the penny stock issuers.  Convertible notes typically have maturity dates 6 months or 1 year after issuance, and provisions allowing the noteholder to convert outstanding principal, accrued interest, and penalty amounts under the notes into newly issued shares of stock at deeply discounted prices from prevailing market prices.  The noteholder's profit typically comes from the significantly discounted price at which the noteholder acquired the stock from the microcap issuers rather than appreciation in share price.  This mechanism, which gives the noteholder a spread or markup on the stock sold, is a common attribute of a securities dealer.

23.     Tri-Bridge regularly invested in convertible notes in a variety of ways and sold common stock that had been converted from such notes at significant discounts from prevailing market prices into the public markets ("Convertible Note Business").  Tri-Bridge's Convertible Note Business included at least the following activities:

        a.      entering into convertible notes directly with microcap issuers;

b.     purchasing or acquiring convertible notes from third parties unaffiliated with the microcap issuers;

c.     purchasing or acquiring portions of convertible notes (e.g., a portion of a convertible note's principal, interest, and/or fees that had not been converted yet) from third parties unaffiliated with the microcap issuers;

d.     securing replacement convertible notes from microcap issuers in exchange for other convertible notes that Tri-Bridge had obtained from third parties unaffiliated with the microcap issuers;

e.     purchasing or acquiring shares of penny stocks from third parties unaffiliated with the microcap issuers when the Defendants knew or should have known that those shares of stock had been converted from convertible notes;

f.     converting the principal, interest, and/or penalty amounts of convertible notes into shares of microcap issuers' common stock; and

g.     selling shares of penny stocks that had been converted from the principal, interest, and/or penalty amounts of convertible notes into the public markets for profits.

24.     In addition to the above, Tri-Bridge also purchased shares resulting from the cashless exercise of warrants, which are another type of security that entitles the holder of the warrants to buy or sell stock at a fixed price called the exercise price. As identified below, at least a portion of Defendants' sales of **Issuer 21's** common stock involved the cashless exercise of warrants, in addition to shares that had been converted from Convertible Note Business.

Defendants knew or should have known that those shares of stock had been issued as a result of the cashless exercise of warrants.

25.     Tri-Bridge typically paid for its Convertible Note Business via wire transfers to the microcap issuers or unaffiliated third parties from which it was receiving the convertible notes or shares, or via wire transfer to an escrow account or escrow agent (or escrowee) established for the Convertible Note Business.

26.     Tri-Bridge deposited the shares it either had converted, or it had purchased already converted, into Tri-Bridge's brokerage accounts, frequently paying rush fees in connection with the deposits to expedite the process.  Tri-Bridge utilized either mail or email to submit documentation to the brokerage firms, and Tri-Bridge obtained attorney opinion letters to assure any transfer agents and its brokerage firms that any restrictive legend could be removed from the shares for future resale to the public.  After depositing the converted shares, Tri-Bridge then sold those newly issued shares into the public market, thus increasing the amount of shares in the hands of the public and the Convertible Note Issuers' outstanding share totals.  Selling large quantities of newly issued shares into the market is a common attribute of a securities dealer.

27.     Tri-Bridge often began to sell the shares immediately or shortly after they were deposited in Tri-Bridge's brokerage accounts, at Forsythe's direction.  In fact, with respect to some of the Convertible Note Issuers, all of Defendants' activity from acquisition of the notes from prior noteholders or converted shares to conversion and selling of the converted shares happened within less than a 6-month period.  For example, all of Defendants' activity with respect to each of **Issuers 3** and **8** occurred within less than 6 months.

28.     At least Tri-Bridge's former Director of Business Development and former Associate worked on Tri-Bridge's Convertible Note Business, including but not limited to, communicating with microcap issuers and brokerage firms via telephone and email.  In addition, at least the former Associate had limited trading authority for Tri-Bridge's brokerage accounts, although any actions she took with respect to those brokerage accounts were at Forsythe's direction, as she acted as a personal assistant to Forsythe.

29.     Although Tri-Bridge's former Director of Business Development and former Associate worked on Tri-Bridge's Convertible Note Business, Forsythe was the ultimate decision-maker with respect to Tri-Bridge's Convertible Note Business, and Forsythe selected the terms for Tri-Bridge's convertible notes, generally receiving very favorable terms for Tri-Bridge.  In addition, Forsythe typically was listed as the signatory on the documents associated with Tri-Bridge's Convertible Note Business, including, but not limited to, the actual convertible notes, assignment and assumption agreements, share purchase agreements, the deposit documentation for the brokerage firms, seller's representation letters representing the shares would be sold in a manner permitted by Rule 144 under the Securities Act of 1933,[1] and the conversion notices for converting the principal, interest, and/or penalty amounts under the convertible notes into stock.

30.     Defendants' Convertible Note Business was a significant and regular part of its business, as shown in **Exhibit 1**, which details at least 31 Convertible Note Issuers for which Tri-Bridge sold common stock converted from convertible notes into the public market during the

---

[1]  Rule 144 enables non-affiliates who acquire restricted stock directly from an issuer in a private transaction to resell it free of restriction into the market after observing a holding period, among other requirements.  See 17 C.F.R. § 210.144.

Relevant Period.  For all 31 Convertible Note Issuers in **Exhibit 1**, Tri-Bridge does not appear to have purchased any common stock of these 31 Convertible Note Issuers in the public market; Tri-Bridge only appears to have sold common stock that it converted or acquired already converted at significant discounts through its Convertible Note Business into the public market.

31.    Indeed, from approximately May 2019 to November 2022, Tri-Bridge made more than $18 million in gross sales from selling at least 10 billion shares of common stock of at least the following 25 Convertible Note Issuers:[2]

a.    For at least the following 17 Convertible Note Issuers, Tri-Bridge had at least 35 convertible notes or portions of such notes, which it converted into the common stock of these issuers, and then, Tri-Bridge sold the newly issued shares into the public markets:  **Issuer 3** (at least 1 convertible note), **Issuer 4** (at least 1 convertible note), **Issuer 5** (at least 1 convertible note), **Issuer 6** (at least 1 convertible note), **Issuer 7** (at least 5 convertible notes), **Issuer 8** (at least 1 convertible note), **Issuer 9** (at least 6 convertible notes), **Issuer 11** (at least 3 convertible notes), **Issuer 12** (at least 2 convertible notes), **Issuer 13** (at least 2 convertible notes), **Issuer 14** (at least 2 convertible notes), **Issuer 15** (at least 1 convertible note), **Issuer 18** (at least 1 convertible note), **Issuer 23** (at least 4 convertible notes), **Issuer 24** (at least 1 convertible note), **Issuer 26** (at least 1 convertible note), and **Issuer 27** (at least 2 convertible notes); and

---

[2]  Sales prior to May 2019 were excluded from **Exhibit 1** for these 25 Convertible Note Issuers because the Commission is limited to five years for seeking monetary relief in the form of disgorgement, prejudgment interest, and civil monetary penalties.  See 15 U.S.C. § 78u(d)(8)(A)(i) and 28 U.S.C. § 2462.

      b.      For at least the following 8 Convertible Note Issuers, Tri-Bridge had common stock, converted from convertible notes into the common stock of these issuers, which Tri-Bridge then sold in the public markets:  **Issuer 1**, **Issuer 10**, **Issuer 16**, **Issuer 17**, **Issuer 21** (a portion of the shares purchased was from the cashless exercise of warrants), **Issuer 22**, **Issuer 28**, and **Issuer 31**.

32.      In addition to the above, Tri-Bridge's Convertible Note Business began before May 2019.  For example, Tri-Bridge had a convertible note with **Issuer 29**, which was dated in or around February 21, 2017.  From approximately January 2018 to March 2019, Tri-Bridge sold the common stock of at least the following 6 Convertible Note Issuers, when that stock had been converted from convertible notes:

      a.      For at least the following 3 Convertible Note Issuers, Tri-Bridge had at least 4 convertible notes or portions of such notes, which it converted into the common stock of these issuers, and then sold the newly issued shares into the public markets:  **Issuer 20** (at least 1 convertible note), **Issuer 25** (at least 1 convertible note), and **Issuer 29** (at least 2 convertible notes); and

      b.      For at least the following 3 Convertible Note Issuers, Tri-Bridge had common stock, converted from convertible notes into the common stock of these issuers, which Tri-Bridge then sold in the public markets:  **Issuer 2**, **Issuer 19** (a portion of **Issuer 19's** stock was known to have been converted from a convertible note, while another portion of it was

suspected to have been converted from a convertible note, as discussed further below), and **Issuer 30**.

33.     Even after Forsythe's creation of a new LLC in or around June 2021, Tri-Bridge continued to hold convertible notes and converted shares, and Tri-Bridge and Forsythe continued to convert such notes and sell converted stock from convertible notes into the public markets until at least November 2022.  Upon information and belief, Tri-Bridge continues to hold some convertible notes, conversion rights, or shares converted from convertible notes.

34.     The below sub-sections are a few representative examples of Tri-Bridge's Convertible Note Business with Convertible Note Issuers from Exhibit 1.

### 1.     ISSUER 27

35.     Tri-Bridge entered into a convertible promissory note directly with **Issuer 27** for a principal amount of $100,000 (accruing interest at a rate of 10% per annum), with an issue date of July 18, 2017, a maturity date of July 18, 2018, and Forsythe as the signatory (the "$100,000 Note").  Upon information and belief, Tri-Bridge may have sent **Issuer 27** approximately $102,000 via wire transfers for the $100,000 Note by mistake.

36.     Under the terms of the $100,000 Note, the price for any conversion was 50% of the lowest daily trading price for **Issuer 27's** common stock during a twenty-day trading period as described further in the note, and **Issuer 27** had "no right to prepay all or any part of the principal."

37.     In connection with convertible notes, the Defendants typically would have an issuer reserve a certain number of shares at the transfer agent so that when Tri-Bridge wanted to convert its notes, there were shares on reserve that could be converted.  However, when the Defendants wanted to convert the $100,000 Note, the Defendants realized **Issuer 27** never had reserved any shares or provided share issuance resolutions to Tri-Bridge, so Tri-Bridge was

unable to make conversions, leading to problems in the relationship between Tri-Bridge and **Issuer 27**.

38.     As a result, in summer 2020, Tri-Bridge renegotiated its relationship with **Issuer 27**.  As part of that renegotiation in summer 2020, Tri-Bridge agreed to:

      a.     help resolve certain ongoing conflicts between Tri-Bridge and the **AD Entities**, which also had business relationships with **Issuer 27**; and

      b.     provide another $25,000 to **Issuer 27** for another convertible note, which Tri-Bridge sent via wire transfer in or around August 11, 2020.

39.     In exchange for the above specified in Paragraph 38 of this Complaint and its sub-parts, **Issuer 27** agreed to provide Tri-Bridge with:

      a.     another convertible note, on which Forsythe was the signatory for Tri-Bridge, for a principal amount of $25,000, with an issue date of July 9, 2020 and a maturity date of July 9, 2021, which accrued interest at a rate of 10% per annum and specified for prepayment penalties, ranging from 118% to 148% of principal plus accrued interest, and under which **Issuer 27** reserved 16,000,000 shares of stock; and

      b.     five share issuance resolutions under the $100,000 Note – each one for 9,000,000 free trading shares of **Issuer 27's** common stock – for a combined total of 45,000,000 shares, under the $100,000 Note.

40.     Tri-Bridge directed **Issuer 27** to sign all five share issuance resolutions (each for 9,000,000 free trading shares of **Issuer 27's** stock), but to only date the first one, which was dated June 29, 2020.

41.     Defendants then agreed to "leak out" the converted **Issuer 27's** stock into the market "at around 15% of the volume per week." Defendants typically stuck to approximately 10% to 15% of the trading volume when selling converted shares of the Convertible Note Issuers' common stock into the public market, to avoid putting too much pressure on the share price.

42.     From approximately July 30, 2020 to April 7, 2021, Forsythe signed five conversion notices—each for 9,000,000 free trading shares of **Issuer 27's** stock—on behalf of Tri-Bridge to convert interest and penalty amounts under the $100,000 Note into 45,000,000 free trading shares of **Issuer 27's** common stock at significant discounts to market prices.

43.     From approximately August 6, 2020 to June 24, 2021, Tri-Bridge sold all 45,000,000 shares of its converted **Issuer 27's** stock into the public market, for a total of approximately $1,201,150.27 in gross sales. Tri-Bridge's profits appear to have stemmed from the fact that Tri-Bridge had received significant discounted prices, not the appreciation in the share price of **Issuer 27's** stock.

**2.     ISSUER 11**

44.     From approximately March 15, 2019 to May 6, 2019, Tri-Bridge obtained at least three convertible notes with respect to **Issuer 11**:

          a.     a convertible note with a principal amount of $200,000 (accruing interest

                 at a rate of 12% per annum, and **Issuer 11** had "no right to prepay all or

                 any part of the principal"), dated March 15, 2019 (with a maturity date of

                 September 15, 2019), that Tri-Bridge obtained directly from **Issuer 11**,

                 and which Forsythe signed on behalf of Tri-Bridge; and under the terms of

                 which, the price for any conversion was 60% of the lowest two daily

                 trading prices (defined further in the note) for **Issuer 11's** common stock

during a 10 trading day (defined further in the note) period ending on the latest complete trading date prior to the conversion date;

b.    a replacement convertible promissory note with a principal amount of $13,272.60 (accruing interest at a rate of 10% per annum, and **Issuer 11** had "no right to prepay all or any part of the principal"), dated March 27, 2019 (with a maturity date of March 27, 2020) that Tri-Bridge obtained from **Issuer 11**, and which Forsythe signed on behalf of Tri-Bridge, by exchanging $13,272.60 (inclusive of accrued interest and/or fees) of a pre-existing convertible note in favor of a prior noteholder that was not Tri-Bridge with a principal amount of $65,000, dated October 26, 2016, as amended, which Tri-Bridge had purchased from the prior noteholder via an assignment and assumption agreement with an effective date of April 9, 2019, which was signed by Forsythe on behalf of Tri-Bridge; and under the terms of the replacement convertible note, the price for any conversion was 30% of the lowest trading price (defined further in the note) during 20 trading days, commencing on the first trading day following delivery and clearing of the notice shares in Tri-Bridge's brokerage account; and

c.    a convertible redeemable note with a principal amount of $27,000 (accruing interest at a rate of 12% per annum, with prepayment penalties ranging from 125% to 150% of principal plus accrued interest), originally dated November 14, 2017 (with a maturity date of November 14, 2018) in favor of an original noteholder that was not Tri-Bridge, but then, Tri-Bridge purchased $26,979.95 of that note from the original noteholder via

an assignment and assumption agreement with an effective date of May 6, 2019, which was signed by Forsythe on behalf of Tri-Bridge; under the terms of the convertible redeemable note, the conversion price was 50% of the lower of two different prices described further in the note.

45. From approximately April 10, 2019 to March 29, 2021, Tri-Bridge made conversions under these convertible notes for approximately 556,354,000 shares of **Issuer 11's** common stock.

46. From approximately May 2, 2019 to April 14, 2021, Tri-Bridge sold all 556,354,000 shares into the public market, earning approximately $2,674,002.42 in gross sales.

3.   **ISSUER 19**

47. In October 2018, Tri-Bridge entered into at least two share purchase agreements with one of the **AD Entities** for a combined total of 415,000,000 shares of **Issuer 19's** common stock:

a.   Under the first share purchase agreement, dated October 8, 2018 (that Forsythe signed on behalf of Tri-Bridge), Tri-Bridge agreed to pay $500 to the **AD Entity** for 140,000,000 unrestricted shares of **Issuer 19's** common stock, which may have been converted from a convertible note given the price for the number of shares and the other share purchase agreement between Tri-Bridge and the **AD Entity** referenced in Paragraph 47(b) of this Complaint; and

b.   Under the second share purchase agreement, dated October 29, 2018 (that Forsythe signed on behalf of Tri-Bridge), Tri-Bridge agreed to pay $1,000 to the **AD Entity** for 275,000,000 unrestricted shares of **Issuer 19's**

common stock, which had been converted from a convertible promissory note.

48.     From approximately October 24, 2018 to December 7, 2018, Tri-Bridge sold all 415,000,000 shares into the public market, earning approximately $81,315.74 in gross sales.  Tri-Bridge appears to have derived profits from the sale of such shares principally from the discounted price at which it acquired the shares (collectively, $1,500 for all 415,000,000 shares), rather than appreciation in the market price of **Issuer 19's** common stock.

### C.     Defendants Tri-Bridge and Forsythe Violated The Federal Securities Laws By Acting As Unregistered Dealers

49.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer  [15 U.S.C. § 78o(a)(1)].

50.     Defendants Tri-Bridge and Forsythe used the mails or other means or instrumentalities of interstate commerce to buy and sell securities as part of their regular business.  For example, Tri-Bridge and Forsythe transferred money through bank wires and used the telephone and e-mails to negotiate and conduct sales transactions.  Tri-Bridge and Forsythe engaged in much of the conduct described in this Complaint in this District.

51.     During the Relevant Period, Defendants Tri-Bridge and Forsythe were not registered with the SEC as dealers.

52.     During the Relevant Period, Defendant Forsythe was not associated with a dealer registered with the SEC.

53.     Registration with the SEC requires the dealer to provide important information to the SEC about its business—some of which is made public—including, but not limited to, the

names of the direct and indirect owners and executive officers of the business, certain

arrangements with other persons or entities, the identities of those who control the business, the

states in which the dealer does business, past criminal or regulatory actions of the dealer or any

affiliate that controls the business, and financial information, including bankruptcy history.

Further registration requires the dealer to join a self-regulatory organization, such as the

Financial Industry Regulatory Authority ("FINRA") or a national securities exchange, which

assist the SEC in regulating the activities of registered dealers and have their own rules.  Finally,

registered dealers are subject to inspection by the SEC and FINRA to ensure that they comply

with the securities laws.

> **D.    Defendants Tri-Bridge and Forsythe Sold Penny Stock**

54.    Defendants Tri-Bridge and Forsythe sold stock that did not meet any of the

exceptions from the definition of a "penny stock," as defined by Section 3(a)(51) of the

Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 [17 C.F.R. § 240.3a51-1] thereunder.

55.    Defendants Tri-Bridge and Forsythe therefore participated in the offering of

penny stock by acting as securities dealers engaged in the selling of penny stock.

## VI.    CLAIM FOR RELIEF

### COUNT I

### (Against Defendants Tri-Bridge and Forsythe)

### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]

56.    The Commission repeats and realleges Paragraphs 1 through 55 of this Complaint

and the information in the attached **Exhibit 1**.

57.    From at least February 2017 through at least November 2022, by engaging in the

conduct described above, Defendants Tri-Bridge and Forsythe, directly and indirectly, made use

of the mails or other means or instrumentalities of interstate commerce to effect transactions in, or to induce or to attempt to induce the purchase or sale of, securities as part of a regular business while not registered with the SEC as dealers and while Forsythe was not associated with any entity registered with the SEC as a dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

58.    By reason of the foregoing, Defendants Tri-Bridge and Forsythe, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

59.    A violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] does not require proof of scienter.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests the Court find the Defendants committed the violations alleged herein, and:

### A.    PERMANENT INJUNCTIONS AGAINST TRI-BRIDGE AND FORSYTHE

60.    Issue a Permanent Injunction, pursuant to Sections 21(d)(1) and 21(d)(8)(B) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(8)(B)], enjoining Tri-Bridge and Forsythe, and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating, directly or indirectly, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### B.    DISGORGEMENT AND PREJUDGMENT INTEREST ON A JOINT AND SEVERAL BASIS AGAINST TRI-BRIDGE AND FORSYTHE

61.    Issue an Order directing Tri-Bridge and Forsythe, jointly and severally, to disgorge all ill-gotten gains or proceeds received, with prejudgment interest thereon, resulting from the acts and/or courses of conduct alleged herein, pursuant to Sections 21(d)(3), 21(d)(5),

21(d)(7), and 21(d)(8)(A)(i) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7), and 78u(d)(8)(A)(i)].

## C.    CIVIL MONETARY PENALTIES AGAINST TRI-BRIDGE AND FORSYTHE

62.    Issue an Order directing Tri-Bridge and Forsythe to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## D.    PENNY STOCK BARS AGAINST TRI-BRIDGE AND FORSYTHE

63.    Issue an Order pursuant to Sections 21(d)(6) and 21(d)(8)(B) of the Exchange Act [15 U.S.C. §§ 78u(d)(6) and 78u(d)(8)(B)], which bars Tri-Bridge and Forsythe from participating in any offering of a penny stock, including acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock; or inducing or attempting to induce the purchase or sale of any penny stock.

## E.    FURTHER RELIEF

64.    Grant such other and further relief as may be just, equitable, necessary, or appropriate in connection with the enforcement of the Federal securities laws and for the protection of investors, including, but not limited to, ordering the Defendants to (a) surrender for cancellation any shares Tri-Bridge obtained through conversion of notes or execution of warrants, (b) surrender any conversion rights under any remaining convertible notes, (c) surrender for cancellation any unexercised warrants that were obtained in conjunction with convertible notes, and (d) provide proof of same to the Commission, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## F.    RETENTION OF JURISDICTION

65.    Further, the Commission respectfully requests that this Court retain jurisdiction over this action and over Defendants to implement and carry out the terms of all orders that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated:  April 29, 2024

Respectfully submitted,

By:

Pascale Guerrier*
Senior Trial Counsel
Direct Telephone:  (305) 982-6301
Email:  GuerrierP@sec.gov

**Attorney for Plaintiff**
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300

*Not admitted in District of New Jersey

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that, to the best of my knowledge after a reasonable search, the matter in controversy alleged in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceeding.

Dated:  April 29, 2024

By: _____
Pascale Guerrier
**Attorney for Plaintiff**
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Direct Telephone:  (305) 982-6301
Email:  GuerrierP@sec.gov

## DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.1(f)

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission

(the "SEC") does not have an office in this district, the United States Attorney for the District of

New Jersey is hereby designated as an eligible alternative to the SEC to receive service of all

notices or papers in the action at the following address:

        Deputy Chief David E. Dauenheimer
        United States Attorney's Office
        District of New Jersey
        Main Office:
        970 Broad Street, 7th Floor
        Newark, NJ 0710

Dated: April 29, 2024

By:                              
        Pascale Guerrier
        **Attorney for Plaintiff**
        **Securities and Exchange Commission**
        801 Brickell Avenue, Suite 1950
        Miami, FL 33131
        Direct Telephone: (305) 982-6301
        Email: GuerrierP@sec.gov